**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3889-22
     A-2406-23

IN THE MATTER OF
IDESHA HOWARD.

_____

IN THE MATTER OF
IDESHA HOWARD, ESSEX
COUNTY, DEPARTMENT
OF CORRECTIONS.

_____

Argued September 11, 2025 – Decided September 26, 2025

Before Judges Marczyk and Bishop-Thompson.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2023-1375 and 2023-2840.

Luretha M. Stribling (Luretha M. Stribling, LLC) argued the cause for appellant Idesha Howard.

Courtney M. Gaccione and Alice M.B. Anderson argued the cause for respondent County of Essex (Chiesa Shahinian & Giantomasi, PC, attorneys; Courtney M. Gaccione and Alice M.B. Anderson, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission

(Brian D. Ragunan, Deputy Attorney General, on the statements in lieu of briefs).

PER CURIAM

In these back-to-back appeals, appellant Idesha Howard, who was formerly employed as a corrections officer by respondent, the Essex County Department of Corrections (Department), and worked at the Essex County Correctional Facility (ECCF), appeals from the New Jersey Civil Service Commission's (Commission) February 28, 2024 final administrative action adopting the Office of Administrative Law's (OAL) initial decision sustaining the disciplinary charges against Howard and upholding her removal. She further appeals from the Commission's July 19, 2023 final administrative action denying her motion for reconsideration of the Commission's December 7, 2022 decision, which denied her request for relief from her indefinite suspension under N.J.S.A. 30:8-18.2 and N.J.S.A. 40A:14-201(a). We affirm.

I.

Howard was hired as a corrections officer by the ECCF in 2014. On August 27, 2018, she worked the night shift from 10:00 p.m. to 6:00 a.m. and provided coverage for another officer in the 2D3 unit from 1:00 a.m. until 2:00 a.m. while the officer was on break. Importantly, the 2D3 unit housed inmate

L.V., who had previously attempted to harm himself and was subsequently placed on suicide watch.

The Department has several policies that apply to supervision of inmates, including the General Housing Unit Post Order Policy (GHU Policy), the Special Housing Unit Policy (SHU Policy), and the Significant Self Harm and Suicide Prevention and Intervention Policy (Suicide Prevention Policy).

The GHU Policy states "[i]nmates shall be personally observed by an officer at least twice . . . per hour, but no more than thirty . . . minutes apart, on an irregular schedule, on ALL housing units."

The SHU Policy states in relevant part:

> Inmates . . . in the Close Custody SHU shall be personally observed at least every thirty . . . minutes on an irregular schedule. Inmates . . . who are violent or mentally disordered or who demonstrate unusual or bizarre behavior shall receive more frequent observation; for such cases . . . the SHU personnel shall personally observe them accordingly or as directed by their immediate supervisor.

> Suicidal inmates . . . shall receive observation in accordance with PS.MED.005 INMATE . . . SUICIDE PREVENTION AND INTERVENTION.

The Suicide Prevention Policy, section G, titled "Housing and Monitoring," states in relevant part:

1.     Constant Observation

A-3889-22

. . . .

    e.    Suicidal inmates . . . will be monitored by assigned officers who maintain constant one-to-one visual observation, twenty-four . . . hours a day, until the inmate . . . is released from suicide watch . . . .

    f.    The assigned officer makes a face to face evaluation notation minimally every fifteen . . . minutes on the Close Custody Supervision Report – Suicide Precautions Observation Sheet.

    g.    Suicidal inmates . . . are to remain under continuous constant observation until seen by a psychiatrist.

2.    Close Observation . . .

    a.    Inmates on suicide precautions who have not been placed in an isolated confinement setting . . . will receive documented close observation at staggered intervals not to exceed fifteen . . . minutes (e.g. [five], [ten], [seven] minutes), checks at least every eight . . . hours by clinical staff, and daily mental health treatment.

3.    Electronic Surveillance . . .

    a.    Observation through electronic surveillance systems may be used to

4

observe inmates and to observe inmates during movements and other activities and only when approved by the Facility Administrator or designee.

b.      Electronic surveillance shall not substitute for regular contact with staff members.

[(Emphasis omitted).]

According to the Close Custody Supervision Report – Constant/Close Observation Sheet (Close Custody Supervision Report) Howard was required to follow and complete, on August 28, 2018, she conducted a custody check of L.V. at 1:00 a.m., 1:16 a.m., 1:30 a.m., 1:46 a.m., and 2:01 a.m. It should be noted the Close Custody Supervision Report states: "Close Custody checks must be conducted every [fifteen] minutes and indicated so by the officer below." However, Howard admitted that while she conducted the 1:16 a.m. and 1:46 a.m. close custody checks in-person, she did not conduct an in-person close custody check of L.V. at 1:00 a.m., 1:30 a.m., or 2:01 a.m. Rather, she claims she monitored L.V. by viewing the live feed from the camera inside his cell.

At approximately 1:46 a.m., the camera in L.V.'s cell was obstructed when L.V. covered the camera with wet paper towels. The camera remained covered

A-3889-22

until 6:00 a.m., when L.V. was found hanging in his cell. L.V. was pronounced dead at 6:27 a.m.

On September 24, 2018, the Essex County Prosecutor's Office (ECPO) notified the ECCF Director (Director) that the ECPO was investigating the August 28 incident. The ECPO advised the Director that any "administrative investigation should cease. The . . . forty[-]five[-]day rule is tolled." The ECPO subsequently charged Howard on March 3, 2022, with knowingly engaging in conduct which creates a substantial risk of death to another person, N.J.S.A. 2C:24-7.1(a)(3); and knowingly making a false record, with the intent to defraud, N.J.S.A. 2C:28-7(a)(1).

In response to the criminal charges, the Director issued a preliminary notice of disciplinary action (PNDA) on March 3, 2022 (March 3, 2022 PNDA or initial PNDA) to Howard, charging her with: failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming of a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); and "[o]ther sufficient cause," N.J.A.C. 4A:2-2.3(a)(12), based on the criminal charges, and for "[v]iolation of [d]epartment [p]olicies and [p]rocedures." Pursuant to the March 3, 2022 PNDA's recommendation, Howard was immediately suspended pending disposition of the criminal charges.

6

The ECPO dismissed the criminal charges against Howard on July 12, 2022, and notified the Internal Affairs Department of the ECCF (ECCF IA) on July 13, 2022, regarding the dismissal. The ECCF IA conducted an administrative investigation, which concluded on August 20, 2022.

Subsequent to receiving the ECCF IA investigation report, the Director issued a supplemental PNDA on August 31, 2022 (August 31, 2022 PNDA), restating the civil service rule violations: failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming of a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); and "[o]ther sufficient cause," N.J.A.C. 4A:2-2.3(a)(12). The "[o]ther sufficient cause" included violations of the Department's policies and procedures, post orders, and the Department's rules and regulations: competence, truthfulness, neglect of duty, standard of conduct, knowledge of rules and regulations, and withholding information or giving false information.

The Department held a disciplinary hearing, and in February 2023, the Hearing Officer sustained the charges set forth in the August 31, 2022 PNDA and recommended Howard be removed from her employment. Howard appealed to the OAL, and a hearing proceeded in front of an Administrative Law Judge

(ALJ) for five days in September and October 2023. Both parties presented witnesses and documentary evidence.

The Department called Lieutenant Carlos Zapata, who worked as a sergeant supervisor for the ECCF IA at the time of the incident. He testified he compared the surveillance video in the corridor to the entries made by Howard. Lieutenant Zapata stated Howard only made two in-person observations out of the five entries she recorded. He further noted L.V. had covered the camera at 1:46 a.m., and therefore, Howard could not have observed him via the surveillance cameras after that time.

On cross-examination, Lieutenant Zapata explained the distinction between close observation and constant observation. He explained the "difference is on a constant observation you're posting an officer right in front of the cell [twenty-four hours a day]. On a close observation the officer . . . doesn't need to be in front of the cell, but has to check the inmate . . . at least every [fifteen] minutes." He noted L.V. was on close observation. He agreed the Close Custody Supervision Report also had the "[c]onstant [e]lectronic" box checked off, which he explained meant the inmate is placed in a cell with a camera. Thus, an officer's responsibilities regarding an inmate on constant electronic observation are "one . . . to view . . . that inmate on the camera and

8

two, to do [the] [fifteen]-minute [face-to-face] checks." Constant electronic observation means "the inmate is placed [in] a camera cell. So [they] can also be observed . . . from the [desk]. This is in addition to the face-to-face [checks] every . . . [fifteen]-minute[s]." Lieutenant Zapata acknowledged the lack of express language in the Suicide Prevention Policy's Electronic Surveillance section indicating the electronic surveillance would be "in addition to" the in-person checks. However, he noted the policy states the "[e]lectronic surveillance shall not substitute for regular contact with staff members." He testified, "[A]ny inmate . . . placed in constant [observation] or close [observation] has to be checked every [fifteen] minutes."

Howard called Lieutenant Wally Gibson as a witness. He confirmed that an officer was still responsible for conducting in-person observations even if an inmate was on constant electronic observation.

Howard also called retired Captain Vera Cornelius, who had worked for the Department for sixteen years. She testified that constant observation under the Suicide Prevention Policy meant an officer would normally sit in front of the inmate's cell twenty-four hours a day. Captain Cornelius explained that inmates were placed in camera cells to "help out with the manpower." She stated SHU observations are required every thirty minutes. The captain testified there

9

is a difference between a desk officer and a tier officer, and she explained a desk officer would observe inmates via the camera while "sitting at the desk where the screens are." Conversely, a tier officer "would . . . walk down and . . . check all" the inmates. The tier officer "has to walk down the tier, walk down to the . . . unit to do their tours. There is no [T.V.] or something they could keep looking at while they're walking, that's the desk person." Captain Cornelius also stated that a tier officer is not responsible for monitoring the cameras like the desk officer, but rather, is responsible for in-person checks and filling out the Close Custody Supervision Report.

Captain Cornelius explained constant electronic supervision was "meant to take the place of . . . an officer being in front of" an inmate's cell twenty-four hours a day. A tier officer would take the Close Custody Supervision Report "in hand and walk down the tier checking off" the report. She also explained that if a camera is blocked, the desk officer would notify their immediate supervisor to get the camera cleaned.

Investigator Vincent Conti was also called to testify for Howard. He conducted the IA investigation on behalf of the Department regarding the death of L.V. He testified his findings were that Howard falsified the Close Custody Observation Report by reporting the conduct of inmate tours not corroborated

10

by video evidence. Specifically, he noted a review of the surveillance video only confirmed two out of the five tours logged by Howard.

The ALJ issued his initial decision on February 1, 2024, upholding Howard's removal from employment. He found the Department "established by a preponderance of the competent, relevant, and credible evidence that . . . [Howard] committed the charged offenses" in the August 31, 2022 PNDA, and thus, "removal [wa]s warranted because the falsification of the [C]lose [C]ustody [O]bservation [R]eport . . . [wa]s such a serious offense that it 'strikes at the heart of discipline within the corrections system.'" (quoting In re Warren, 117 N.J. 295, 299 (1989)). He found under the Department's "written policy," L.V. "was required to have in-person observations by a corrections officer in fifteen-minute intervals," and "it was part of [Howard]'s job duties on . . . August 28, 2018, to perform in-person checks of L.V. every fifteen minutes and document those checks in the [C]lose [C]ustody [O]bservation [R]eport for L.V." He further noted:

> [Howard] documented in the [C]lose [C]ustody [O]bservation [R]eport that she performed in-person checks of L.V. at 1:00 a.m., 1:16 a.m., 1:30 a.m., 1:47 a.m., and 2:01 a.m. Video surveillance showed that [Howard] only performed in-person checks at 1:16 a.m. and 1:45 a.m. . . . , despite entries in the [C]lose [C]ustody [O]bservation [R]eport indicating otherwise. Additionally, [she] noted in the [C]lose [C]ustody

11 A-3889-22

[O]bservation [R]eport that L.V. was quiet at 1:30 a.m. Video footage revealed that at that time, L.V. was repeatedly kicking his cell door with his legs and was not quiet.

The ALJ noted Howard contended: "she was only obligated to perform in-person checks of L.V. every [thirty] minutes"; "she performed checks of L.V. at 1:00 a.m., 1:30 a.m., and 2:00 a.m. by observing him remotely via the camera in his cell"; and she "did not make the 2:01 a.m. entry in the [C]lose [C]ustody [O]bservation [R]eport," but rather, "an unknown third party made that entry." He determined:

> [Howard's] arguments lack[ed] merit and credibility. [She] could have performed in-person observations of L.V. every [thirty] minutes if L.V. was housed in general population. However, L.V. was housed in a special tier as he was deemed a suicide risk. Therefore, per [the Department]'s written policy, [Howard] was required to make observations of L.V. every [fifteen] minutes. . . . Per [the Department]'s written policy, [she] was required to make those observations in-person. . . . Additionally, testimony from . . . Captain Cornelius established that it was the responsibility of the desk officer to monitor cell cameras and the tier officer to make in-person observations of inmates. As [Howard] was a tier officer, she was not responsible for monitoring cell cameras[.] Additionally, the camera in L.V.'s cell was blocked from 1:46 a.m. to 6[:00] a.m. As a result, [she] could not have observed L.V. via the cell camera as she said she did. [Howard]'s arguments that she did not make the 2:01 a.m. entry in the [C]lose [C]ustody [O]bservation [R]eport is belied by the fact that the entry is in her handwriting and has her name

12

affixed to it. . . . I give [Howard]'s arguments no weight whatsoever.

As a result, the ALJ determined "[Howard] was required as part of her job duties on August 28, 2018, between 1:00 a.m. and 2:00 a.m. to perform [fifteen] minute in-person checks of L.V. and that [she] did not do so"; "that the entries that [Howard] made in the [C]lose [C]ustody [O]bservation [R]eport reflecting that she performed in-person checks of L.V. at 1:00 a.m., 1:30 a.m., and 2:01 a.m. were false"; and "that [Howard] did not perform those in-person checks and that she falsified those entries on the [C]lose [C]ustody [O]bservation [R]eport." Based on these findings, he found the Department "met its burden on the[] . . . disciplinary charges and that the . . . charges against [Howard] must be upheld. Based upon the serious nature of [Howard]'s falsification of the [C]lose [C]ustody [O]bservation [R]eport . . . removal [wa]s the appropriate penalty."

On February 28, 2024, the Commission issued its final decision, adopting the ALJ's findings of fact and conclusions. However, the Commission noted the ALJ's penalty discussion was limited.[1] Nevertheless, the Commission found:

> [w]hile the ALJ's penalty discussion was brief, the Commission agree[d] that removal [wa]s the proper

---

[1] The Commission expressed its preference for ALJs "to indicate, for example: an appellant's previous disciplinary history, if any; whether the recommended penalty is based on an application of progressive discipline; and a description of any aggravating or mitigating factors . . . considered, if any."

penalty [despite Howard's lack of a known disciplinary history] . . . . The infractions . . . [Howard] committed [we]re egregious and pose[d] a serious safety and security risk in a secured facility. Moreover, . . . [Howard]'s submission of false reports indicating work that was not actually performed [wa]s of great concern. . . . [She] [wa]s a law enforcement officer, who [wa]s held to a higher standard, where such serious misconduct cannot be tolerated. Accordingly, the Commission agree[d] with the ALJ that . . . [Howard]'s conduct was egregious and wholly inappropriate for a law enforcement officer and worthy of removal without regard to progressive discipline. . . . [Her] actions would clearly tend to undermine the public trust and as such, the Commission [found] the penalty of removal neither disproportionate to the offense nor shocking to the conscious.

Turning to Howard's appeal from the Commission's July 19, 2023 procedural decision denying her motion for reconsideration, Howard notes that after the criminal charges were dismissed on July 12, 2022, she "was not served with [the August 31, 2022] PNDA within [forty-five] days after the dismissal of the criminal charges as was required per N.J.S.A. 30:8-18.2." She asserts she was served with the August 31, 2022 PNDA on September 10, 2022, "which was out of time."

On September 11, 2022, Howard appealed to the Commission for interim relief, citing procedural defects surrounding the forty-five-day rule. She argued the August 31, 2022 PNDA was issued out of time because the forty-five-day

rule under N.J.S.A. 30:8-18.2 started to run on July 13, 2022, the day after the criminal charges were dismissed. She also contended that because she was suspended on March 3, 2022, N.J.S.A. 40A:14-201(a) required a final determination within 180 days from the date of her suspension, and thus she should have been returned to payroll on August 31, 2022.

The Commission issued its decision on December 7, 2022, granting Howard back pay for the period of July 13, 2022, through August 31, 2022, but denied all other interim relief, finding the forty-five-day rule had not been violated, and the 180-day rule was inapplicable. Specifically, the Commission found Howard's reliance on N.J.S.A. 40A:14-201(a), the 180-day rule, was "misplaced," as "there was clearly a criminal investigation and criminal charges. Accordingly, the 180-[day] rule [was] not implicated" regarding her suspension.

The Commission also found Howard's reliance on N.J.S.A. 30:8-18.2, the forty-five-day rule, was "misplaced" because

> [t]here is no indication in the statute that the passage . . . "the [forty-five]-day limit shall begin on the day after the disposition of the criminal investigation" was meant to subvert an appointing authority's ability to conduct a proper investigation after the disposition of criminal charges and deprive the person filing the complaint from obtaining sufficient information to file the matter.
>
> [(Quoting N.J.S.A. 30:8-18.2).]

The Commission also relied on Roberts v. State, Division of State Police, 191 N.J. 516, 526 (2007), where our Supreme Court interpreted a similar statute, N.J.S.A. 53:1-33,[2] and adopted our holding that "[i]t would be illogical for the Legislature to have provided the necessary investigative period to determine whether disciplinary charges should issue when no criminal conduct has been alleged, but to have shortened that period when potential criminal conduct is under investigation." (quoting Roberts v. State, Div. of State Police, 386 N.J. Super. 546, 552-53 (App. Div. 2006) (alteration in original)). The Commission determined "the person filing the complaint, filed the August 31, 2022 PNDA only [eleven] days after receiving sufficient information to do so. Therefore, no [forty-five]-day rule violation [wa]s evident."

However, the Commission noted:

> Upon dismissal of the criminal charges, an employee is entitled to immediate reinstatement to employment following an indefinite suspension or prompt service of any remaining administrative charges upon which the appointing authority wishes to base disciplinary action. Even when an employee is ultimately removed . . . [they are] entitled to an award of back pay for the period between dismissal of the criminal charges and service of a PNDA setting forth any remaining administrative charges.

---

[2] N.J.S.A. 53:1-33 imposes a forty-five-day time limit similar to the one imposed by N.J.S.A. 30:8-18.2, except that it applies only to the State Police.

A-3889-22

Thus, because the criminal charges against Howard were dismissed on July 12, 2022, and she "was not returned to work thereafter and a new PNDA was not issued until August 31, 2022," the Commission found she was "entitled to back pay from July 13, 2022[,] to August 31, 2022." The Commission denied "any further interim relief." Howard moved for reconsideration.

On July 19, 2023, the Commission issued a final decision denying Howard's request for reconsideration. In response to Howard's argument that the 180-day rule applied because the charges in the March 3, 2022 PNDA stemmed from events that took place on August 28, 2018, the Commission found such an argument "was not made in the initial interim relief request," and "[r]egardless," N.J.S.A. 40A:14-201 "only applies to administrative charges and not criminal charges," and this matter "originally involved criminal charges." It also noted "there [wa]s no evidence that the person authorized to bring administrative charges had sufficient knowledge to do so at any time prior to August 31, 2022. Thus, no violation of the [forty-five-day] rule [wa]s evident."

The Commission also found Howard's argument <u>Roberts</u> did not apply because it interpreted a different statute, "unpersuasive," as it was previously addressed. Regarding Howard's argument pursuant to N.J.S.A. 40A:14-149.2, that she was entitled to back pay starting from her initial suspension on March

3, 2022, until the issuance of the August 31, 2022 PNDA, rather than starting from the date of the dismissal of the criminal charges, the Commission found Howard failed to "address the fact that N.J.S.A. 40A:14-149.2 specifically applies only to municipal police officers and d[id] not provide any evidence of a similar statute for Correctional Police Officers."

Howard also argued that once the criminal charges were dismissed, the ECCF IA investigator testified he conducted no further investigation prior to the August 31, 2022 PNDA being issued, and this showed the forty-five-day rule was violated. The Commission was "not persuaded," and noted Howard provided only "mere allegations" to confirm her claims about the investigator's testimony being accurate. It further found "there [wa]s no evidence that another individual did not perform some investigation or, more importantly, that the person authorized to bring the charges had sufficient evidence to do so before being provided a complete investigation report." The Commission also noted it "already remedied that delay in its prior decision by granting back pay for that period."

## II.

In No. A-2406-23, Howard argues the ALJ acted in an arbitrary and capricious manner, resulting in a decision inconsistent with the evidentiary

record. She contends the ALJ disregarded the testimony of her witnesses concerning the standard procedures for conducting inmate observations, including documenting Close Custody Observation sheets and the monitoring of inmates via surveillance video. She further asserts the ALJ erred in not allowing her to treat Investigator Conti as an adverse witness and interfered in the questioning of various witnesses. Howard also argues the ALJ exhibited bias in favor of the Department and adopted the testimony of Lieutenant Zapata, who contradicted established policies.

In No. A-3889-22, Howard argues the Commission acted arbitrarily in disregarding the requirements of N.J.S.A. 30:8-18.2. Additionally, she contends the Commission failed to return her to work with back pay when the criminal charges were dismissed. She maintains the Commission misinterpreted the start date for the forty-five-day rule in the context of a dismissed criminal matter. Lastly, Howard argues the Commission's failure to issue a decision within 180 days of departmental charges contravenes N.J.S.A. 40A:14-201(2)(a).

The scope of our review of agency decisions is narrow. Appellate courts review decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022)

19

(citing Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301-02 (2015)). That enhanced deference stems, in part, from "the executive function of administrative agencies." Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). The reviewing court "does not substitute its judgment of the facts for that of an administrative agency." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)). Rather, the reviewing court "defer[s] to matters that lie within the special competence" of the administrative agency. Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 202 (App. Div. 2003). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

On appeal, the judicial role in reviewing an administrative action is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;

(2) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). Furthermore, "[w]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 583 (App. Div. 2014) (internal quotation marks omitted) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)). "If [an a]ppellate [court] is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Id. at 584 (quoting Clowes, 109 N.J. at 588).

A-3889-22

We review an agency's disciplinary sanction under a similar deferential standard and only modify a sanction "when necessary to bring the agency's action into conformity with its delegated authority." In re Herrmann, 192 N.J. at 28 (quoting In re Polk, 90 N.J. 550, 578 (1982)). A reviewing court "has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency." Ibid. (quoting In re Polk, 90 N.J. at 578). When reviewing an agency's disciplinary action, we consider "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (quoting In re Polk, 90 N.J. at 578 (internal citation and quotation marks omitted)).

### A.

Howard asserts she "adhered to" the GHU and SHU policies "because she conducted tours of the tiers on which the inmates were housed in cells every thirty minutes and the tours were documented on the Close Custody" Supervision Report. She argues she followed the policies by "engaging in electronic observations of the [i]nmates in camera cells following the time requirements and touring the cells every thirty minutes." Howard contends she "monitored the [i]nmates electronically at the times between the tours which

22

resulted in either electronic monitoring or personal observation of the [i]nmates in camera cells every fifteen minutes." She asserts the GHU and SHU policies were "disregarded by the ALJ," who she contends "reached a conclusion . . . inconsistent with the . . . policies and procedures, the camera footage and the testimony of the witnesses." Howard concedes she only personally observed L.V. at 1:16 a.m. and 1:46 a.m. and that she observed him via the surveillance cameras at 1:00 a.m. and 1:30 a.m.

Howard asserts Lieutenant Zapata "erroneously testified that inmates on close observation have to be monitored every fifteen minutes" and that the constant electronic observation policy did not require an officer to go to the inmate's cell every fifteen minutes. She further claims the ALJ did not discuss the testimony of Captain Cornelius, Lieutenant Gibson, and Sergeant James Miller in his decision. She asserts that consistent with the policies, her "observations would consist of electronic monitoring at the desk and tours twice per hour." She contends that under the Suicide Prevention Policy, "[c]onstant [o]bservation requires that the inmate have an assigned officer whose sole responsibility is to sit outside of that inmate's cell and every fifteen minutes, the officer must stand up and look into the cell to observe the inmate." On the other hand, she asserts "[c]onstant [e]lectronic [observation] allows for monitoring of

23

the inmates in camera cells by viewing the inmates on the monitor," and L.V. was on constant electronic observation. Thus, she contends L.V. "was on '[c]onstant [e]lectronic' monitoring[,] which meant that he was entitled to a tour . . . every thirty minutes."

We are unpersuaded by Howard's argument that the ALJ failed to properly consider all the evidence because he did not reference the testimony of Captain Cornelius, Lieutenant Gibson, and Sergeant Miller. It is sufficiently established that "credibility is an issue which is peculiarly within the [factfinder's] ken." State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991). The deference owed to an administrative agency decision is particularly appropriate when the agency adopts the ALJ's findings because the ALJ had the opportunity to hear live testimony and judge the witness's credibility. Clowes, 109 N.J. at 587-88. Moreover, an ALJ is "not required to discuss the testimony and the statements of every witness and describe in detail why he found some more credible than others." Marjarum v. Twp. of Hamilton, 336 N.J. Super. 85, 100 (App. Div. 2000).

Howard's assertion that the ALJ ignored Captain Cornelius's testimony is belied by the record, as the ALJ's initial decision noted Captain Cornelius explained the difference between a tier officer and a desk officer, and that

24

Howard was a tier officer on the night in question. Furthermore, Captain Cornelius's testimony was consistent with Lieutenant Zapata's testimony that a tier officer was responsible for in-person checks in addition to the desk officer conducting a review of the surveillance cameras under the Constant Electronic Observation policy. The ALJ was not required to accept the testimony of Lieutenant Gibson or Sergeant Miller, and he was permitted to interpret the policies and make findings based on the testimony and evidence he found credible. He sufficiently articulated his findings and connected them to his legal conclusions.

More fundamentally, the record amply supported the ALJ's findings as adopted by the Commission. Howard acknowledged she did not conduct close observations of L.V. every fifteen minutes, but instead relied on electronic monitoring for her observations at 1:00 a.m. and 1:30 a.m. She maintains this was permitted under the policies. We are unpersuaded by her contentions.

Although the GHU and SHU policies allow for personal observation every thirty minutes in certain circumstances, the SHU policy establishes more frequent observation requirements for inmates who are suicidal. Moreover, the Suicide Prevention Policy clearly supersedes the GHU and SHU policies and thus guides our analysis.

A-3889-22

The Suicide Prevention Policy's Close Observation section requires inmates not placed in isolated confinement to "receive documented close observation" "not to exceed fifteen . . . minutes." Although electronic surveillance is also permitted with the approval of the "Facility Administrator," the Suicide Prevention Policy specifically provides, "Electronic surveillance shall not substitute for regular contact with staff members." The Close Custody Supervision Report required electronic observation of L.V. However, this did not eliminate the requirement for in-person observations. L.V. was on close observation, as evidenced by the Close Custody Supervision Report, and therefore required "documented close observation" every fifteen minutes. Because L.V. was noted to be suicidal, he was required to have "close custody checks" pursuant to the policy and as noted on the Close Custody Supervision Report.

Even if we were to adopt Howard's interpretation of the Suicide Prevention Policy and her contention that electronic monitoring was sufficient to fulfill her obligations, there was still sufficient credible evidence in the record for the ALJ and the Commission to find she falsified the Close Custody Supervision Report. Howard noted on the Close Custody Supervision Report that everything was quiet at 2:01 a.m. However, the ALJ determined visual

26

access to L.V.'s cell by the camera was impeded by the paper towels, and it would have been impossible for Howard to see L.V. through the camera. Thus, even if the in-person checks were only required for the two times Howard asserts, she still fabricated the Close Custody Supervision Report by documenting checks that did not actually occur. Accordingly, we conclude the Commission's decision was not arbitrary, capricious, or unsupported by the record.

B.

Howard contends the ALJ and opposing counsel repeatedly interrupted her counsel's questioning of Investigator Conti, and the ALJ refused to allow him to be questioned as an adverse witness. She also asserts the ALJ's actions exhibited bias when he engaged in "detailed questioning" of Howard's witness. She further claims the ALJ failed to engage in a progressive discipline analysis. Moreover, Howard contends the Commission "rubberstamped" his conclusion.

Howard alleges the "fact that there was any belief that [Investigator] Conti was not adverse to [her] . . . was unreasonable, . . . arbitrary, capricious and inconsistent with the law." During her counsel's questioning of Investigator Conti, the Department's counsel objected to the line of questioning, to which her

27

counsel responded she was calling Investigator Conti "as an adverse witness."

The following colloquy occurred:

> [ALJ]: Did you say that you considered Investigator Conti an adverse witness?
>
> [Counsel]: He was called an adverse witness because he's not my witness. He was their witness at the hearing and certainly his position is adverse to my client.
>
> [ALJ]: . . . To be considered an adverse witness, . . . there are two pieces of foundation that need to be laid. Number one, that the witness is not responsive to your questions, or two, that the witness has shown that he is adverse in his responses. . . .
>
> [Counsel]: . . . [H]e was not my witness at the [internal] hearing. He's not a witness . . . beneficial to . . . Howard.
>
> [ALJ]: I don't know that. . . .
>
>      . . . .
>
> [ALJ]: And what you may have wanted to do in calling Investigator Conti was to establish the steps that he took in the investigation. I don't know if that's adverse to . . . Howard or not . . . . I believe that the foundation necessary for the court to find out what was adverse and give you the opportunity to lead that witness is what I described . . . . I had not seen that as of yet.
>
>      . . . .
>
> [ALJ]: I think that Investigator Conti has been as responsive as he can be.

"When a party calls an adverse party or a witness identified with an adverse party, or when a witness demonstrates hostility or unresponsiveness, interrogation may be by leading questions, subject to the discretion of the court." N.J.R.E. 611(c). "[A]ctual antagonism between the examiner and witness is the cornerstone for permission under [Rule 611(c)] to lead." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 8 on N.J.R.E. 611 (2025-2026). "The control of examination, both direct and cross, resides in [the trial judge]" whose "discretion . . . is a broad one [which] we will not interfere with . . . absent a clear abuse of . . . discretion." Cestero v. Ferrara, 110 N.J. Super. 264, 273 (App. Div. 1970) (citations omitted).

Howard did not identify Investigator Conti as adverse on her witness list. Moreover, the ALJ here did not find Investigator Conti to be hostile when the issue was initially raised. Later in the testimony, in response to an objection by the Department, the judge noted:

> I'm also going to note for the record that I have found [counsel]'s questions to be leading. I have given room. . . . I believe that [counsel] wishes to have this witness declared as adverse, that application has not been made, so I have not ruled upon it, but I'm trying to accommodate [counsel] as best as I can, so I'm going to respectfully overrule the objection.

Howard's counsel did not raise the issue again. We do not find Howard's counsel's attempt to question Investigator Conti was thwarted by the ALJ, who explained the procedure for declaring a witness as adverse. Furthermore, Howard was permitted to lead Investigator Conti at various times, and she does not point to any issue she was not permitted to address in questioning Investigator Conti. The ALJ did not misapply his discretion.

Regarding Howard's contentions the ALJ questioned her witnesses more than her adversary, we note, "[i]n a bench trial . . . , a judge may examine witnesses to clarify testimony, aid the court's understanding, elicit material facts, and assure the efficient conduct of the trial." D.M.R. v. M.K.G., 467 N.J. Super. 308, 320-21 (App. Div. 2021) (first citing State v. Medina, 349 N.J. Super. 108, 131 (App. Div. 2002); and then citing N.J.R.E. 614).

"The intervention of a trial judge in the questioning of a witness is both a power and a duty, and forms part of the judiciary's general obligation to ensure a fair trial 'conducted in [an] orderly and expeditious manner.'" Medina, 349 N.J. Super. at 130-31 (alteration in original) (quoting State v. Laws, 50 N.J. 159, 181 (1967)). "Trial judges are vested with the authority to propound questions to qualify a witness's testimony and to elicit material facts on their own initiative and within their sound discretion." Id. at 131. "Claims of judicial misconduct

pose a severe problem to our appellate tribunals for 'it is difficult to review a charge of unfairness upon a dry record.'" Ibid. (quoting State v. Guido, 40 N.J. 191, 208 (1963)). A trial judge's intervention "is a 'desirable procedure,' but it must be exercised with restraint." Ibid. (quoting Vill. of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958)).

Even in a bench trial, "a trial judge must take special care to craft questions in such a manner to avoid being perceived as an advocate for any side of a dispute." L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 537 (App. Div. 2011). However, "isolated instances of judicial annoyance or impatience do not warrant the drastic remedy of vitiating an otherwise valid" decision. Medina, 349 N.J. Super. at 132. A "reviewing court should not evaluate the trial judge's conduct from the vantage point of twenty-twenty hindsight. Rather, appellate courts should recognize that trial judges often must act without the benefit of prolonged and objective research." Ibid.

We do not find the ALJ's questions and admonitions to witnesses exceeded his discretionary authority to manage the trial. The questions appear to have been for the purpose of clarifying testimony and developing the record to assure the ALJ had sufficient information to render a decision. The witnesses'

interrogation facilitated the orderly presentation of competent evidence and did not result in any unfair prejudice to Howard.

Lastly, any issue with the ALJ's failure to engage in a progressive discipline analysis was addressed by the Commission, which independently determined removal was the proper remedy. The Commission acknowledged Howard's lack of a disciplinary history, but nevertheless noted, "[t]he infractions . . . [Howard] committed [we]re egregious and pose[d] a serious safety and security risk in a secured facility." It further commented, Howard's "submission of false reports indicating work that was not actually performed is of great concern. . . . [Howard] [wa]s a law enforcement officer, who [wa]s held to a higher standard, where such serious misconduct cannot be tolerated." It then noted it "agree[d] with the ALJ that . . . [Howard]'s conduct was egregious and wholly inappropriate for a law enforcement officer and worthy of removal without regard to progressive discipline." We conclude the Commission's decision to terminate Howard was not arbitrary, capricious, or unreasonable under the facts presented.

C.

We next turn to Howard's procedural arguments asserting the Commission erred in interpreting N.J.S.A. 30:8-18.2 and N.J.S.A. 40A:14-201(2)(a). She

reprises her arguments made before the Commission. Howard asserts that the forty-five-day clock started on July 13, 2022, the day the ECPO notified the Department that the criminal charges were dismissed, and thus, N.J.S.A. 30:8-18.2 required she be served with the August 31, 2022 PNDA by August 26, 2022. Because the second PNDA was not served until September 10, 2022, she argues it was untimely and should be dismissed.

Howard contends the language in N.J.S.A. 30:8-18.2 is meant to be read as having two prongs. She asserts "[f]or the persons who do not have criminal charges the application of the [forty-five]-day rule is based on the first [prong] of the statute which references when there was sufficient information by the investigator to know that there were violations of the internal rules and regulations." Howard claims this "component of the statute does not apply" to her case because criminal charges were involved. She argues the second prong of N.J.S.A. 30:8-18.2, which "references having criminal charges" is applicable here, and the Department failed to pursue charges within forty-five days of the dismissal of the criminal charges. She asserts the Commission failed to consider the legislative intent of N.J.S.A. 30:8-18.2 and that "strict application of the second prong" of N.J.S.A. 30:8-18.2 requires this court to find July 13, 2022,

33

the day IA was informed the criminal charges were dismissed, is the first day of the forty-five-day clock.

N.J.S.A. 30:8-18.2 states in relevant part:

> A person shall not be removed from employment . . . as a county correctional . . . officer, or suspended . . . for a violation of the internal rules and regulations . . . of the county corrections department, unless a complaint charging a violation of those rules and regulations is filed no later than the [forty-fifth] day after the date on which the person filing the complaint obtained sufficient information to file the matter upon which the complaint is based. A failure to comply with this section shall require a dismissal of the complaint. The [forty-five]-day time limit shall not apply if [the] investigation . . . is included directly or indirectly within a concurrent investigation of that officer for a violation of the criminal laws of this State; the [forty-five]-day limit shall begin on the day after the disposition of the criminal investigation.

In Roberts, our Supreme Court analyzed the forty-five-day rule under N.J.S.A. 53:1-33,[3] which is similar to N.J.S.A. 30:8-18.2, except that it applies

---

[3] N.J.S.A. 53:1-33 states:

> A complaint charging a violation of the internal rules and regulations established for the conduct of the State Police shall be filed no later than the [forty-fifth] day after the date on which the person filing the complaint obtained sufficient information to file the matter upon which the complaint is based. . . . The applicable time limit shall not apply if an investigation of an officer or

A-3889-22

to the State Police. 191 N.J. at 520. There, the petitioner was criminally charged with assault and harassment, and he failed to report the incident in accordance with the rules and regulations governing State Troopers. Id. at 518. The State Police began an internal disciplinary investigation, which revealed the petitioner may have been engaging in fraud, and thus they referred the matter to the Division of Criminal Justice for a criminal investigation and suspended their internal investigation. Ibid. The Division of Criminal Justice notified the State Police on December 22, 2003, there was insufficient evidence to bring the fraud charges, and the State Police resumed its internal investigation, "which included a January 26, 2004, interview of [the petitioner]." Id. at 519. Then, "[o]n February 17, 2004, the report of the internal investigation was forwarded to the . . . Superintendent of the State Police. Three days later, the Superintendent authorized disciplinary charges . . . . That disciplinary notice was served on [the petitioner] on March 1, 2004." Ibid. The petitioner claimed N.J.S.A. 53:1-33 imposed a forty-five-day limit "on the filing of any disciplinary charge, and that

trooper for a violation of the internal rules or regulations of the law enforcement unit is included directly or indirectly within a concurrent investigation of that person for a violation of the criminal laws of this State. The applicable time limit shall begin on the day after the disposition of the criminal investigation.

35

because the charge against him was filed more than forty-five days after the disposition of his criminal investigation, it was barred." Ibid.

After addressing the legislative history of the statute, the Court determined "it is not the happening of the event giving rise to discipline that starts the clock for purposes of evaluating timeliness, but the receipt of 'sufficient information' by the one who is authorized to file the charge that is significant." Id. at 524 (quoting N.J.S.A. 53:1-33). "[T]imeliness of a charge is judged based upon when the [person filing the complaint] has received the report of the investigation." Ibid. The Court found adopting the petitioner's interpretation of the statute—that charges must be filed within forty-five days of dismissal of the criminal charges—"would impose a time limit unrelated to the statute's intent that there be a complete and thorough investigation." Id. at 525. It "decline[d] to interpret the statute to require the [person filing the complaint] to conduct his investigation in an abbreviated manner simply to meet a deadline over which he had no control." Ibid. The Court thus interpreted "the reference to the 'applicable time frame' [in N.J.S.A. 53:1-33] to subsume the earlier reference to the [person filing the complaint]'s receipt of sufficient information on which to base a charge." Ibid.

The Court agreed with us that "[i]t would be illogical for the Legislature to have provided the necessary investigative period to determine whether disciplinary charges should issue when no criminal conduct has been alleged, but to have shortened that period when potential criminal conduct is under investigation." Id. at 526 (alteration in original) (quoting Roberts, 386 N.J. Super. at 552-53). Thus, the Court "interpret[ed N.J.S.A. 53:1-33] to mean that once the criminal investigation has ended with a decision not to prosecute, disciplinary charges must be filed 'no later than the [forty-fifth] day after the date on which [the person filing the complaint] . . . obtained sufficient information' to file those charges, . . . as measured by his receipt of the investigative report." Ibid. (quoting N.J.S.A. 53:1-33).

We are satisfied the Commission properly relied on Roberts in interpreting the analogous statute at issue here. The ECPO directed the Department to cease its investigation in September 2018. The Department began its IA investigation on July 13, 2022, after learning the criminal charges had been dismissed. The ECCF IA completed its investigation on August 20, 2022, and sent it to the Director two days later. The forty-five-day time period thus began on August 22, 2022—the day the Director received the IA report and obtained sufficient information to file the complaint—and therefore, the second PNDA was timely

filed on August 31, 2022. Accordingly, the forty-five-day rule under N.J.S.A. 30:8-18.2 was not violated, and the Commission did not act arbitrarily in rejecting Howard's argument.

D.

Howard asserts the Commission erred in finding the 180-day rule under N.J.S.A. 40A:14-201(a) did not apply. She was indefinitely suspended on March 3, 2022. The 181st day after that is August 31, 2022. Thus, she asserts she should have been returned to payroll on August 31, 2022. She argues the "criminal charges were dismissed on July 12, 2022," which created "a reasonable reliance" on N.J.S.A. 40A:14-201(a) that she could "expect[] that [she] would be returned to payroll" on August 31, 2022.

N.J.S.A. 40A:14-201(a) states in relevant part:

> When a law enforcement officer . . . is suspended from performing [their] official duties without pay for a complaint or charges, other than (1) a complaint or charges relating to the subject matter of a pending criminal investigation, inquiry, complaint, or charge whether pre-indictment or post indictment, or (2) when the complaint or charges allege conduct that also would constitute a violation of the criminal laws of this State . . . and the law enforcement agency employing the officer . . . seeks to terminate that officer's . . . employment for the conduct that was the basis for the officer's . . . suspension without pay, a final determination on the officer's . . . suspension and

termination shall be rendered within 180 calendar days from the date the officer . . . is suspended without pay.

If a final determination is not rendered within those 180 days . . . the officer . . . shall, commencing on the 181st calendar day, begin again to receive the base salary [they were] being paid at the time of [their] suspension and shall continue to do so until a final determination on the officer's . . . termination is rendered.

We conclude the Commission correctly interpreted the statute, which renders the 180-day rule inapplicable where there are charges relating to a criminal complaint. Howard ignores the language of N.J.S.A. 40A:14-201(a), which provides it does not apply in the context of "a complaint . . . relating to the subject matter of a pending criminal investigation, inquiry, complaint, or charge whether pre-indictment or post indictment, or . . . when the complaint or charges allege conduct that also would constitute a violation of the criminal laws of this State." Here, the initial PNDA stemmed from charges related to a criminal complaint. The Commission noted, "there was clearly a criminal investigation and criminal charges. Accordingly, the 180-[day] rule is not implicated in the instant case as to [Howard's] . . . suspension" in March 2022. We discern no basis to disturb the Commission's determination.

E.

Lastly, Howard asserts N.J.S.A. 40A:14-149.2 entitled her to be returned to her position with back pay and benefits going back to the day she was first suspended, March 3, 2022. She asserts the Commission's decision to grant her back pay from July 12, 2022, the day the ECPO dismissed the criminal charges, to August 31, 2022, when the second PNDA was issued, was a miscalculation.

N.J.S.A. 40A:14-149.2 states:

> If a suspended police officer is found not guilty at trial, the charges are dismissed or the prosecution is terminated, said officer shall be reinstated to [their] position and shall be entitled to recover all pay withheld during the period of suspension subject to any disciplinary proceedings or administrative action.

As the Commission noted, N.J.S.A. 40A:14-149.2 applies to police officers, not corrections officers, and Howard has not provided any authority suggesting it applies to corrections officers. Accordingly, its decision was not arbitrary, capricious, or unreasonable.

To the extent we have not specifically addressed any remaining arguments raised by Howard, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in A-3889-22 and in A-2406-23.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3889-22